IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED JUN 12 '02 PM 4 :29 USDCALS

THE TRAVELERS INDEMNITY CO. OF ILLINOIS,

Plaintiff,

v.

CIVIL ACTION NO. 02-0436-CG

CARSON & COMPANY, INC.; ROBERTO ROMERO; CARSON KIMBROUGH; NORMAN FOWLER; DARLA SEAMANS; COLONIAL BANK; JACKSON HEWITT, INC.; ALABAMA FAST TAX, INC. D/B/A JACKSON HEWITT TAX SERVICE OF FOLEY, ALABAMA; EDGAR HUITE; IRAZELMA BARRERA; BRENDA LEON; KARINA NOGALES; LAURA OLEA; MARIA MAZON; PATRICIA LEYVA; DULCE ZAZUETA; CARMEN CRABTREE ORTIZ; JUAN ORTIZ; FERNANDO FELIX; ISABEL REAL; JUAN FELIX; MARIA MAGDALENA VASQUEZ; ALFREDO FELIX; PEDRO MIRANDA; ARASELI MIRANDA; IRLANDA LEYVA; JORGE LAURENO; SILVIA LAURENO; CARLOS ENCINAS; SIXTO ENCINAS; and BLANCO LEON,

Defendants.

COMPLAINT FOR DECLARATORY JUDGMENT

1. Plaintiff The Travelers Indemnity Co. of Illinois ("Travelers") is a corporation incorporated in Illinois and having its principal place of business in Connecticut.

2. Defendant Carson & Company, Inc. is a corporation incorporated in Alabama and having its principal place of business in Alabama.

3. Defendant Roberto Romero is a citizen of Alabama.

4. Defendant Carson Kimbrough is a citizen of Alabama.

5. Defendant Norman Fowler is a citizen of Alabama.

6. Defendant Darla Seamans is a citizen of Alabama.

7. Defendant Colonial Bank is a corporation incorporated in Alabama and having its principal place of business in Alabama.

8. Defendant Jackson Hewitt, Inc. is a corporation incorporated in Virginia and having its principal place of business in New Jersey.

9. Defendant Alabama Fast Tax, Inc. d/b/a Jackson Hewitt Tax Service of Foley, Alabama is a corporation incorporated in Alabama and having its principal place of business in Alabama.

10. Defendant Edgar Huite is a citizen of Alabama.

11. Defendants Irazelma Barrera, Brenda Leon, Karina Nogales, Laura Olea, Maria Mazon, Patricia Leyva, Dulce Zazueta, Carmen Crabtree Ortiz, Juan Ortiz, Fernando Felix, Isabel Real, Juan Felix, Maria Magdalena Vasquez, Alfredo Felix, Pedro Miranda, Araseli Miranda, Irlanda Leyva, Jorge Laureno, Silvia Laureno, Carlos Encinas, Sixto Encinas, and Blanco Leon are citizens of Mexico.

12. The amount in controversy exceeds $75,000, exclusive of interest and costs.

13. The Court has jurisdiction of this action under 28 U.S.C. § 1332 and the Declaratory Judgments Act, 28 U.S.C. § 2201.

I.

TRAVELERS POLICIES

14. Travelers issued the following commercial general liability (CGL) policies to Carson & Co.: Y-630-115K8547-TIL-98 (effective 11/1/98-99), Y-630-115K8547-TIL-99 (effective 11/1/99-00), and Y-630-115K8547-TIL-00 (effective 11/1/00-01).

15. Travelers issued the following umbrella policies to Carson & Co.: YSM-CUP-115K856-0-TIL-98 (effective 11/1/98-99), YSM-CUP-115K856-0-TIL-99 (effective 11/1/99-00), and YSM-CUP-115K856-0-TIL-00 (effective 11/1/00-01).

16. Defendant Carson & Co. and its employees, Defendants Romero, Kimbrough, Fowler, and Seamans, have requested that Travelers defend and indemnify them against the claims in Irazelma Barrera, et al. v. Carson & Company, Inc., et al., Baldwin County, Alabama Circuit Court Civil Action No. CV-01-1236.

17. Travelers is participating in the defense of Carson & Co., Romero, Kimbrough, Fowler, and Seamans under the CGL policies under a reservation of rights.

II.

THE BARRERA COMPLAINT

18. Twenty-two Plaintiffs filed the Barrera suit against Carson & Co., Romero, Kimbrough, Fowler, Seamans, Colonial Bank, Jackson Hewitt, Inc., Alabama Fast Tax, Inc. d/b/a Jackson Hewitt Tax Service of Foley, and Edgar Huite.

19. The Barrera complaint alleges that in April 1999, Carson & Co., Romero, Kimbrough, and/or Fowler recruited Plaintiff Barrera, a Mexican citizen, to work at Carson & Co.'s

packing plant in Bon Secour, Alabama from May 1999 through January 2000; that Romero was in charge of overseeing the Mexican employees in housing provided for them and also had some degree of supervisory authority over the Mexican employees at the plant; and that Romero was also entrusted with transporting the Mexican employees in a company van.

20. The Barrera complaint further alleges that soon after Barrera began working for Carson & Co., Romero demanded sexual favors, including sexual intercourse, from Barrera, and spoke to others about Barrera in derogatory sexual terms; that Romero threatened to send Barrera back to Mexico if she did not comply; that Barrera complied and had sexual relations with Romero, and as a result contracted a sexually transmitted disease; and that at the end of the work season, in about February of 2000, Barrera returned to Mexico.

21. The Barrera complaint further alleges that Barrera returned to Carson & Co. for the next packing season, beginning on or about April 24, 2000; that Romero's sexual advances and forced sexual relations did not cease and, as a result, Barrera became pregnant; that after learning that Barrera was pregnant, Romero induced or forced Barrera to consume an unknown or unidentified pill, and again forced Barrera to have sexual relations and acted violently and roughly while forcing her to have sexual relations; and that Barrera suffered a miscarriage and received medical treatment.

22. The Barrera complaint further alleges that Barrera continued working at Carson & Co. until September because Romero told Barrera that she had to pay medical bills incurred because of the miscarriage; that Romero told Barrera that she would have to make those payments through him by means of installments deducted from her pay; that Barrera later learned that the money deducted by Romero was never paid to the hospital or the doctor; that Romero also forced other

residents of Carson & Co.'s condominium to contribute money; that Romero intended to and did humiliate Barrera by calling a public meeting of the condominium residents and openly announcing that the "contribution" was meant to help Barrera because she needed an "abortion"; that Romero took the "contributed" money away from Barrera but did not reimburse the other employees/residents who contributed the money; and that Romero frequently convened meetings of the residents of the Carson & Co. condominium and falsely accused Barrera of sexual conduct with other men and/or made other derogatory, sexual remarks about her during these meetings.

23. The Barrera complaint further alleges that in late August 2000, Barrera escaped from the condominium and ended her employment with Carson & Co., and that she then learned that Romero had not paid the hospital or doctor any of the money deducted from her pay.

24. The Barrera complaint further alleges that other Mexican citizens, including Plaintiffs Brenda Leon, Karina Nogales, Laura Olea, Maria Mazon, Patricia Leyva, Dulce Zazueta, Carmen Crabree Ortiz, Juan Ortiz, Fernando Felix, Isabel Real, Juan Felix, Maria Magdelena Vasquez, Alfredo Felix, Pedro Miranda, Araseli Miranda, Irlanda Leyva, Jorge Laureno, Silvia Laureno, Carlos Encinas, Sixto Encinas, and Blanco Leon, were also lured by the offer of housing, better wages and better working conditions to come to work for Carson & Co.

25. The Barrera complaint further alleges that Plaintiff Brenda Leon came to work for Carson & Co. in early May 2000; that Romero forced Leon to have sexual intercourse, threatening to send her back to Mexico if she did not comply; that Leon was also the subject of accusations by Romero of sexual conduct with other men and/or other derogatory, sexual remarks during the meetings previously described; and that shortly after this, Leon escaped from the condominium and left her employment with Carson & Co.

26. The Barrera complaint further alleges that Plaintiff Karina Nogales came to work for Carson & Co. on or about April 24, 2000; that soon after she arrived, Romero began making overtly sexual remarks to her and demanding sexual favors; that while making these demands, Romero touched Nogales in an inappropriate and/or offensive manner; that Nogales refused to comply with Romero's demands; that in retaliation, Romero had Nogales transferred to a less desirable work area the next day; and that Nogales was also the subject of accusations by Romero of sexual conduct with other men and/or other derogatory, sexual remarks during the meetings previously described.

27. The Barrera complaint further alleges that Plaintiff Laura Olea came to work for Carson & Co. on or about April 24, 2000; that soon after she arrived, Romero demanded sexual favors including sexual relations; that when she refused, Romero told other Carson & Co. employees that he had seen Olea having sex with other men and made other sexually insulting comments about her; that Romero also sent messages to Olea through other workers continuing to demand sexual favors including sexual relations; and that in September 2000, Olea escaped from the condominium and left her employment with Carson & Co.

28. The Barrera complaint further alleges that Romero removed, or had someone remove, the locks from the bedroom doors of the female residents at the Carson & Co. condominium, and that Romero frequently entered the women's bedrooms without knocking or otherwise announcing his entrance.

29. The Barrera complaint further alleges that after the Plaintiffs' work shifts were over each day, Romero transported the Plaintiffs back to the condominium in a company van; that they were not allowed to leave, even after work hours, unless Romero transported them in the van; and that Romero represented to Plaintiffs that he was entitled to, and did, require Plaintiffs to pay him

for transporting them.

30. The Barrera complaint further alleges that Carson & Co., Kimbrough, Fowler, and/or Seamans allowed Romero to treat Plaintiffs as virtual slaves or prisoners and/or failed to take reasonable steps to prevent Romero from so treating the Plaintiffs, and that the Plaintiffs, or some of them, complained about Romero's actions to Fowler, the plant manager, and/or Seamans, a supervisor, but Fowler and Seamans did nothing about Romero's conduct.

31. The Barrera complaint further alleges that Carson & Co., Kimbrough, Fowler, Seamans, and/or Romero required the Plaintiffs to leave Foley and go back to Mexico and return in early January at their own expense whether or not they wanted to make the trip, and that they represented to Plaintiffs that they were entitled to require this.

32. The Barrera complaint further alleges that Carson & Co., Kimbrough, Romero, Fowler, and/or Seamans refused to allow Plaintiffs to do their own banking; that they forged endorsements on the Plaintiffs' paychecks each week and cashed the checks, charging each employee for this "service" that they neither wanted nor needed; and that they represented to Plaintiffs that this was the normal or standard procedure for processing their paychecks.

33. The Barrera complaint further alleges that the Defendants allowed Plaintiffs to open savings accounts; that the Defendants later substituted forged signature cards for the ones that the Plaintiffs signed; that Plaintiffs Karina Nogales, Maria Mazon, Carmen Crabtree Ortiz and Juan Ortiz deposited money into their savings accounts; and that later, after they had left their employment with Carson & Co., these Plaintiffs attempted to withdraw money from their savings accounts and learned that the accounts had been closed and that the funds from these accounts had been withdrawn without their knowledge or authorization.

34. The Barrera complaint further alleges that Defendants Jackson Hewitt Inc., Jackson Hewitt Tax Service of Foley, and/or Edgar Huite allowed Carson & Co., Romero, Kimbrough, Fowler, and/or Seamans to forge approximately 28 tax returns belonging to workers who had already returned to Mexico, including Plaintiffs Pedro Miranda, Araseli Miranda, Irlanda Leyva, Jorge Laureno, Carlos Encinas, and Sixto Encinas, and that these workers never saw their returns or received their refund checks.

35. Count I of the Barrera complaint, for "Assault and Battery," alleges that Romero assaulted Plaintiffs Irazelma Barrera, Brenda Leon, Karina Nogales, and Laura Olea by intentionally and unlawfully offering to touch them in a hostile, inappropriate, and unwanted manner and created in the mind of these Plaintiffs a well-founded fear that a battery or hostile, inappropriate, and unwanted touching was imminent and that he had the ability to do what he was threatening to do. It further alleges that Romero battered and/or touched these Plaintiffs in an offensive and inappropriate manner. It also alleges that Romero was acting in the line and scope of employment with Carson & Co. when the acts complained of occurred, or that Carson & Co., Kimbrough, Fowler, and/or Seamans ratified Romero's acts.

36. Count II, "Defamation-Slander," alleges that Romero slandered and defamed Plaintiffs Irazelma Barrera, Brenda Leon, Karina Nogales, and Laura Olea by publicly making false statements impugning these Plaintiffs' character and morals; that Romero was acting in the line and scope of employment with Carson & Co. when he slandered or defamed these Plaintiffs; or that Carson & Co., Kimbrough, Fowler, and/or Seamans ratified Romero's acts. This count further alleges that as a result of Romero's remarks, Barrera, Leon, Nogales and Olea were injured in that they "were subjected to embarrassing public comments alleging their involvement in inappropriate

and/or unacceptable sexual conduct" and that they "suffered substantial mental anguish."

37. Count III, for "Invasion of Privacy," alleges that Romero invaded the privacy of Plaintiffs Irazelma Barrera, Brenda Leon, Karina Nogales, Laura Olea, Maria Maxon, Patricia Leyva, Dulce Zazueta, Isabel Real, Araseli Miranda, Irlanda Leyva, Silvia Laureno, and Blanco Leon by removing, or having someone remove, the locks from the female residents' bedroom doors at the Carson & Co. condominium, and by entering these women's bedrooms without knocking or otherwise announcing his entrance. It further alleges that Carson & Co., Kimbrough, Romero, Fowler, and/or Seamans improperly and illegally intruded into the Plaintiffs' private affairs by substituting new signature cards regarding Plaintiffs' savings accounts and by closing accounts without Plaintiffs' knowledge and/or authorization. It further alleges that Carson & Co., Romero, Kimbrough, Fowler, and/or Seamans improperly and illegally intruded into the private affairs of Plaintiffs Pedro Miranda, Araseli Miranda, Irlanda Leyva, Jorge Laureno, Carlos Encinas, and Sixto Encina by forging their tax returns without their knowledge and/or authorization after they had already returned to Mexico. It further alleges that Romero was acting in the line and scope of his employment with Carson & Co., or that Carson & Co., Kimbrough, Fowler, and/or Seamans ratified Romero's acts.

38. Count IV, for "Fraud/Suppression of Material Facts," alleges that Romero negligently, wantonly, or willfully represented to Plaintiff Barrera that she had to pay the medical bills she incurred because of the miscarriage and loss of her baby and that she should make the payments to him and that he would pay the money to the hospital and doctor; that Romero did not intend to pay the money to the hospital or doctor and misrepresented his intentions to Barrera; that Romero deceived Barrera; that in reliance upon these representations, Barrera paid Romero in excess

of $1,000.00; that after she left Carson & Co., Barrera learned that Romero had not paid the money to the hospital or doctor; and that Barrera was required to pay the medical bills to the hospital and doctor again. It further alleges that as a result of Romero's misrepresentations, Barrera suffered mental anguish.

39. Count IV also alleges that Carson & Co., Kimbrough, Fowler, Seamans, and/or Romero negligently, wantonly, or willfully represented to Plaintiffs Irazelma Barrera, Brenda Leon, Karina Nogales, Laura Olea, Maria Mazon, Patricia Leyva, Dulce Zazueta, Carmen Crabtree Ortiz, Juan Ortiz, Fernando Felix, Isabel Real, Juan Felix, Maria Magdelena Vasquez, Alfredo Felix, Pedro Miranda, Araseli Miranda, Irlanda Leyva, Jorge Laureno, Silvia Laureno, Carlos Encinas, Sixto Encinas, and Blanco Leon that they were entitled to, and did, require Plaintiffs to pay money to Romero for transporting them to stores or doctors; that they were entitled to require Plaintiffs to leave Foley, Alabama, go back to Mexico, and return in early January at their own expense whether or not they wanted to make the trip; and that these Defendants were entitled to forge endorsements on Plaintiffs' paychecks each week, cash the checks, and charge each employee for this "service." Plaintiffs allege that these representations were false, that the Defendants knew or should have known the representations were false, that the Defendants made these representations to induce Plaintiffs to pay for unnecessary "services," and that the Defendants deceived Plaintiffs. Plaintiffs allege that as a result of these misrepresentations, these Plaintiffs were injured in that they were induced to give money to the Defendants which Plaintiffs would not have done but for the misrepresentations, that they were induced or forced to spend their own money for travel to Mexico which they would not have done but for the misrepresentations, and that they suffered mental anguish.

40. Count V, for "Negligence, Wantonness, and Wilfulness," alleges that Carson & Co., Kimbrough, Fowler, and/or Seamans negligently, wantonly, or willfully failed to properly supervise Romero and negligently, wantonly or willfully entrusted supervisory authority to Romero. As a result, Plaintiffs were injured in that they were induced to give money to these Defendants and/or to pay travel expenses as described above, which they would not have done but for the wrongful conduct; their rights to privacy were substantially interfered with; and they suffered mental anguish.

41. Count VI, for "Conversion," alleges that Carson & Co., Kimbrough, Fowler, Seamans, and/or Romero caused Plaintiffs to lose substantial sums of money, wrongfully caused a substantial interference with Plaintiffs' property rights in the above-referenced sums of money, and/or wrongfully obtained possession of substantial sums of money which rightfully belonged to Plaintiffs.

42. Count VII, for "Intentional Infliction of Emotional Distress," alleges that Carson & Co., Kimbrough, Fowler, Seamans, and/or Romero intentionally and/or willfully caused Plaintiffs to suffer substantial emotional distress.

43. Count VIII, for "Outrage," alleges that Carson & Co., Kimbrough, Fowler, Seamans, and/or Romero's conduct in assaulting and battering Plaintiffs, defaming and slandering Plaintiffs, invading Plaintiffs' privacy, defrauding Plaintiffs, negligently, wantonly, or intentionally inflicting emotional distress upon Plaintiffs, and stealing or improperly and unlawfully taking Plaintiffs money or interfering with Plaintiffs' ownership rights in their money was so outrageous and unconscionable a behavior as to shock the social conscience of the community, and seriously deviated from the socially acceptable norms and standards of the community as a whole.

44. The last count, misnumbered "VII" instead of IX, for "Conspiracy," alleges that Carson & Co., Kimbrough, Fowler, and/or Seamans conspired with Romero to do the wrongful acts described or agreed and conspired to assist Romero in doing the wrongful acts described.

45. The Barrera Plaintiffs seek compensatory damages, punitive damages, interest, costs, and attorney's fees.

III.

CGL POLICIES

46. Travelers does not owe coverage for the Barrera complaint, and therefore has no duty to defend or indemnify Carson & Co., Romero, Kimbrough, Fowler, or Seamans against such claims, based on the grounds and policy provisions set forth below:

**A. Provisions common to all CGL policies**

47. The insuring agreement for Coverage A in the Travelers CGL policies, as modified by the endorsement titled "Changes in Commercial General Liability Coverage Form" (and also by the endorsement titled "Amendment of Insuring Agreement - Known Injury or Damage" in the 11/1/99-00 and 11/1/00-01 CGL policies), provides that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." It further provides that the insurance applies "only if...[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence'" and "[t]he 'bodily injury' or 'property damage' occurs during the policy period."

48. The 11/1/98-99 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," and the 11/1/99-00 CGL policy, in the "Xtend Endorsement," define "bodily injury"

as "bodily injury, mental anguish, sickness or disease sustained by a person, including death resulting from any of these at any time." The 11/1/00-01 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," defines "bodily injury" as "bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time." The CGL policies define "property damage" and "occurrence" as follows:

> *"Property damage" means:*
>
> *a.* *Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*
>
> *b.* *Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.*
>
> * * *
>
> *"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*

49. To the extent that the Plaintiffs seek damages for bodily injury, mental anguish, sickness, or disease, their claims are for "bodily injury" as defined in the 11/1/98-99 and 11/1/99-00 CGL policies. To the extent that they seek damages for bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, sickness, or disease, their claims are for "bodily injury" as defined in the 11/1/00-01 CGL policy. Their other alleged injuries and damages do not constitute "bodily injury." Plaintiffs do not seek damages for any "property damage." Plaintiffs' claims for attorney's fees do not seek "damages." Plaintiffs do not allege an "occurrence," and their injuries and damages were not caused by an "occurrence." Some or all of the injuries and damages alleged

did not occur during the 11/1/98-99 policy period; some or all did not occur during the 11/1/99-00 policy period; and some or all did not occur during the 11/1/00-01 policy period.

50. The Plaintiffs seek punitive damages. Such damages are recoverable in Alabama only if the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Such conduct is not an "occurrence," and such damages are not caused by an "occurrence."

51. The CGL policies exclude coverage for "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured." This exclusion bars coverage for the Plaintiffs' claims under Coverage A.

52. As noted above, punitive damages are recoverable only if the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. The exclusion for "'bodily injury' or 'property damage' expected or intended from the standpoint of the insured" bars coverage for punitive damages under Coverage A.

53. The CGL policies also exclude coverage for "[a]ny obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law." This exclusion bars coverage for the Plaintiffs' claims under Coverage A to the extent, if any, that the Defendants are obligated for such claims under worker's compensation law or other law referenced in the exclusion.

54. The CGL policies also contain the following exclusion under Coverage A:

*This insurance does not apply to:*

* * *

*e.* *Employer's Liability*

*"Bodily injury" to:*

*(1) An "employee" of the insured arising out of and in the course of:*

*(a) Employment by the insured; or*

*(b) Performing duties related to the conduct of the insured's business; or*

*(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of (1) above.*

*This exclusion applies:*

*(1) Whether the insured may be liable as an employer or in any other capacity; and*

*(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.*

*This exclusion does not apply to liability assumed by the insured under an "insured contract."*

To the extent that the Plaintiffs seek damages for "bodily injury," this exclusion bars coverage for the Plaintiffs' claims under Coverage A.

55. The exclusion in the CGL policies titled "Damage to Property" excludes coverage for "[p]roperty damage to...[p]roperty loaned to you" and "[p]ersonal property in the care, custody or control of the insured." To the extent, if any, that the Plaintiffs seek damages for "property damage," this exclusion bars coverage for the Plaintiffs' claims under Coverage A.

56. The exclusion in the CGL policies titled "Damage to Impaired Property or Property Not Physically Injured" bars coverage for "'[property damage' to 'impaired property' or property that has not been physically injured arising out of...[a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." To the extent, if any,

that the Plaintiffs seek damages for "property damage," this exclusion bars coverage for the Plaintiffs' claims under Coverage A.

57. The endorsement to the CGL policies titled "Employment-Related Practices Exclusion" provides as follows:

> A. *The following exclusion is added to paragraph 2., Exclusions of COVERAGE A-BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section 1-Coverages):*
>
> *This insurance does not apply to:*
>
> 1. *"Bodily injury" to:*
>
> a. *A person arising out of any:*
>
> 1. *Refusal to employ that person;*
>
> 2. *Termination of that person's employment; or*
>
> 3. *Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or*
>
> b. *The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.*
>
> *This exclusion applies*
>
> a. *whether the insured may be held liable as an employer or in any other capacity; and*
>
> b. *to any obligation to share damages with or repay someone else who must pay damages because of the injury.*

To the extent that the Plaintiffs seek damages for "bodily injury," this exclusion bars coverage for the Plaintiffs' claims under Coverage A.

58. The insuring agreement for Coverage B in the CGL policies, as modified by the endorsement titled "Changes in Commercial General Liability Coverage Form," provides that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies." It further provides:

> *This insurance applies to:*
>
> *(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you;*
>
> *(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services; but only if the offense was committed in the "coverage territory" during the policy period.*

The CGL policies define "advertising injury" and "personal injury" as follows:

> *"Advertising injury" means injury arising out of one or more of the following offenses:*
>
> *a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;*
>
> *b. Oral or written publication of material that violates a person's right of privacy;*
>
> *c. Misappropriation of advertising ideas or style of doing business; or*
>
> *d. Infringement of copyright, title or slogan.*
>
> * * *
>
> *"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:*

a. *False arrest, detention or imprisonment;*

b. *Malicious prosecution;*

c. *The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;*

d. *Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or*

e. *Oral or written publication of material that violates a person's right of privacy.*

59. Plaintiffs do not seek damages for "advertising injury," or for any offense committed in the course of advertising Carson & Co.'s goods, products, or services. None of the claims in the complaint, with the exception of Count II ("Defamation-Slander") and possibly Count III ("Invasion of Privacy") to the extent that it is based on Romero's entering the women's bedrooms, seeks damages for "personal injury." Damages for bodily injury, mental anguish, sickness, or disease, which the 11/1/98-99 and 11/1/99-00 CGL policies define as "bodily injury," are expressly excluded from the definition of "personal injury" and so are not covered under Coverage B in those policies. Damages for bodily injury, mental anguish, mental injury, shock, fright, disability, humiliation, sickness, or disease, which the 11/1/00-01 CGL policy defines as "bodily injury," are expressly excluded from the definition of "personal injury" and so are not covered under Coverage B in that policy. None of the claims, injuries, or damages alleged in the complaint arose out of an offense committed in the course of Carson & Co.'s business. Some or all of the alleged offenses were committed outside the 11/1/98-99 policy period; some or all were committed outside the 11/1/99-00 policy period; and some or all were committed outside the 11/1/00-01 policy period.

60. The endorsement to the CGL policies titled "Employment-Related Practices Exclusion" provides as follows:

> *B. The following exclusion is added to paragraph 2., Exclusions of COVERAGE B-PERSONAL AND ADVERTISING INJURY LIABILITY*
>
> *(Section I - Coverages):*
>
> *This insurance does not apply to:*
>
> *1. "Personal injury" to:*
>
> *a. A person arising out of any:*
>
> *(1) Refusal to employ that person;*
>
> *(2) Termination of that person's employment; or*
>
> *(3) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, or discrimination directed at that person; or*
>
> *b. The spouse, child, parent, brother or sister of that person as a consequence of "personal injury" to that person at whom any of the employment-related practices described in paragraphs (1), (2) or (3) above is directed.*
>
> *This exclusion applies:*
>
> *a. Whether the insured may be liable as an employer or in any other capacity; and*
>
> *b. To any obligation to share damages with or repay someone else who must pay damages because of the injury.*

To the extent that the Plaintiffs seek damages for "personal injury," this exclusion bars coverage for the Plaintiffs' claims under Coverage B.

61. The 11/1/98-99 CGL policy, in the "Manufacturers & Wholesalers Xtend

Endorsement"; the 11/1/99-00 CGL policy, in the "Xtend Endorsement"; and the 11/1/00-01 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," contain the following exclusions under Coverage B:

> *1. Paragraph 2., Exclusions of COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY (Section I - Coverages) is deleted and replaced by the following:*
>
> *2. Exclusions.*
>
> *This insurance does not apply to:*
>
> *a. "Personal injury" or "advertising injury":*
>
> *(1) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;*
>
> *(2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period; or*
>
> *(3) Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured.*

To the extent that the Plaintiffs seek damages for "personal injury," and to the extent, if any, that they seek damages for "advertising injury," one or more of these exclusions bars coverage for the Plaintiffs' claims under Coverage B.

62. The 11/1/98-99 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement"; the 11/1/99-00 CGL policy, in the "Xtend Endorsement"; and the 11/1/00-01 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," also contain the following exclusions under Coverage B:

> *2. Exclusions.*
>
> *This insurance does not apply to:*

* * *

b. *"Personal injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability:*

(1) *Assumed in a contract or agreement that is an "insured contract", provided the "personal injury" arises out of an offense committed subsequent to the execution of the contract or agreement; or*

(2) *That the insured would have in the absence of the contract or agreement.*

c. *"Advertising injury":*

(1) *Arising out of breach of contract, other than misappropriation of advertising ideas under an implied contract;*

(2) *Arising out of the failure of goods, products or services to conform with advertised quality or performance;*

(3) *Arising out of the wrong description of the price of goods, products or services;*

(4) *Arising out of an offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting; or*

(5) *For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.*

To the extent that the Plaintiffs seek damages for "personal injury," and to the extent, if any, that they seek damages for "advertising injury," one or more of these exclusions bars coverage for the Plaintiffs' claims under Coverage B.

63. The endorsement to the CGL policies titled "Changes in Commercial Liability Coverage Form" contains the following provisions regarding "Who Is An Insured":

F. *WHO IS AN INSURED (Section II) is amended as follows...:*

*1. Paragraphs 1. and 2.a. are deleted and replaced by the following:*

*1. If you are designated in the Declarations as:*

* * *

*d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.*

*2. Each of the following is also an insured:*

*a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for:*

*(1) "Bodily injury" or "personal injury";*

*(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;*

*(b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of paragraph (1)(a) above;*

*(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in paragraphs (1)(a) above; or*

*(d) Arising out of his or her providing or failing*

*to provide professional health care services.*

(2) *"Property damage" to property;*

(a) *Owned, occupied or used by,*

(b) *Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).*

64. Romero, Kimbrough, Fowler, and Seamans are not insureds, because (a) if Romero, Kimbrough, Fowler, and Seamans are executive officers or directors, the Plaintiffs' claims are neither based on nor arise out of Romero, Kimbrough, Fowler, or Seamans' duties as such officers or directors, (b) if Romero, Kimbrough, Fowler, and Seamans are stockholders, the Plaintiffs' claims do not seek to impose liability on Romero, Kimbrough, Fowler, or Seamans as stockholders, and (c) if Romero, Kimbrough, Fowler, and Seamans are employees, the Plaintiffs' claims are based on acts outside the scope of Romero, Kimbrough, Fowler, and Seamans' employment by Carson & Co. or acts not committed while performing duties related to the conduct of Carson & Co.'s business. In addition, Romero, Kimbrough, Fowler, and Seamans, as employees, are not insured for "bodily injury" or "personal injury" to co-employees (such as the Plaintiffs) while the co-employees were either in the course of their employment or performing duties related to the conduct of Carson & Co.'s business. Furthermore, to the extent that the Plaintiffs seek damages for "property damage," Romero, Kimbrough, Fowler, and Seamans are not insured because such "property damage" was to property owned, occupied, or used by, rented to, in the care, custody, or control of, or over which

physical control is being exercised by, Carson & Co. or its employees.

65. The 11/1/98-99 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement"; the 11/1/99-00 CGL policy, in the "Xtend Endorsement"; and the 11/1/00-01 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," provide as follows:

*K. INJURY TO CO-EMPLOYEES*

*1. It is agreed that your "employees" are insureds with respect to "bodily injury" to a co-"employee" in the course of the co-"employee's" employment by you, provided that this coverage for your "employees" does not apply to acts outside the scope of their employment by you or while performing duties unrelated to the conduct of your business.*

*2. Subparagraphs 2.a.(1)(a), (b) and (c) and 3.a. of WHO IS AN INSURED (Section II) do not apply to "bodily injury" for which insurance is provided by paragraph 1. above.*

66. Romero, Kimbrough, Fowler, and Seamans are not insured, and no coverage is afforded to them, under the "injury to co-employees" provision, because the Plaintiffs' claims are based on acts outside the scope of Romero, Kimbrough, Fowler, and Seamans' employment by Carson & Co. or while performing duties unrelated to the conduct of Carson & Co.'s business. In addition, Romero, Kimbrough, Fowler, and Seamans are not insured under the above provision for "bodily injury" to the Plaintiffs' that was not in the course of the Plaintiffs' employment with Carson & Co.

67. The CGL policies, in Section IV, "Commercial General Liability Conditions," includes the following:

*2. Duties In The Event Of Occurrence, Offense, Claim Or Suit.*

*a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent*

*possible, notice should include:*

> *(1) How, when and where the "occurrence" or offense took place;*
>
> *(2) The names and addresses of any injured persons and witnesses; and*
>
> *(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.*

Carson & Co., Romero, Kimbrough, Fowler, and Seamans did not give notice to Travelers of any "occurrence" or offense as soon as practicable, and as required by the above provision.

68. The 11/1/98-99 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement"; the 11/1/99-00 CGL policy, in the "Xtend Endorsement"; and the 11/1/00-01 CGL policy, in the "Manufacturers & Wholesalers Xtend Endorsement," add the following to the "Commercial General Liability Conditions":

> *1. The following is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV), paragraph 2. (Duties In The Event of Occurrence, Offense, Claim or Suit):*
>
> *Notice of an "occurrence" or of an offense which may result in a claim under this insurance shall be given as soon as practicable after knowledge of the "occurrence" or offense has been reported to you, one of your executive officers (if you are a corporation), one of your partners (if you are a partnership), one of your managers (if you are a limited liability company), or an "employee" (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice.*
>
> *Knowledge by other "employee(s)" of an "occurrence" or of an offense does not imply that you also have such knowledge.*

Carson & Co., Romero, Kimbrough, Fowler, and Seamans did not give Travelers notice of an "occurrence" or offense as soon as practicable after knowledge of such was reported to Carson & Co., one of its executive officers, or an employee designated by Carson & Co. to receive such notice,

as required by the above provision.

69. The CGL policies include an endorsement titled "Limitation When Two or More Policies Apply," stating as follows:

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE PART*
*EMPLOYEE BENEFITS LIABILITY COVERAGE PART*
*LIQUOR LIABILITY COVERAGE PART*
*PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART*

*PROVISIONS*

*1. Injury, damage or loss might be covered by this policy and also by other policies issued to you by us or any affiliate. When these other policies contain a provision similar to this one, the amount we will pay is limited. The maximum that we will pay under all such policies combined is the highest limit that applies in any one of these policies.*

*2. This does not apply to any personal liability policy or to any policy number containing the letters CUP, EX, PRS, SPS, XS or IXL.*

Travelers also issued an employment-practices-liability policy to Carson & Co. Accordingly, this endorsement may limit the coverage afforded.

**B. Other Provisions in CGL Policies**

70. The endorsement to the 11/1/98-99 CGL policy titled "Exclusion – Discrimination" provides as follows:

*1. COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY - is amended by adding the following additional exclusion:*

*(This Insurance does not apply to:)*

*"Bodily injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital*

*status, race, creed, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.*

*2. COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY - is amended by adding the following additional exclusion:*

*(This insurance does not apply to:)*

*"Personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.*

To the extent that the Plaintiffs seek damages for "bodily injury" or "personal injury," this exclusion bars coverage under the 11/1/98-99 CGL policy.

71. The endorsement to the 11/1/99-00 and 11/1/00-01 CGL policies titled "Amendment of Insuring Agreement – Known Injury or Damage" provides:

*b. This insurance applies to "bodily injury" and "property damage" only if:*

* * *

*(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is an Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or " property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.*

*c. "Bodily injury" or property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.*

*d. "Bodily injury" or "property damage" will be deemed to have been known*

*to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:*

*(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;*

*(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;" or*

*(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.*

To the extent that the Plaintiffs seek damages for "bodily injury," and to the extent, if any, that they seek damages for "property damage," Carson & Co. and its employees are not entitled to coverage for such injury or damage under the 11/1/99-00 CGL policy, because prior to the policy period, one or more insureds or employees authorized by Carson & Co. to give or receive notice of an "occurrence" or claim knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

72. The 11/1/00-01 CGL policy includes an endorsement titled "Exclusion - Discrimination" that provides:

*1. COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY - is amended by adding the following additional exclusion:*

*(This Insurance does not apply to:)*

*"Bodily injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.*

*2. COVERAGE B - PERSONAL AND ADVERTISING INJURY LIABILITY - is amended by adding the following additional exclusion:*

> *(This insurance does not apply to:)*
>
> *"Personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.*

To the extent that the Plaintiffs seek damages for "bodily injury" or "personal injury," these exclusions bar coverage for the Plaintiffs' claims under the 11/1/00-01 CGL policy.

73. The Manufacturers & Wholesalers Xtend Endorsement in the 11/1/00-01 policy states as follows:

> *P. KNOWLEDGE AND NOTICE OF OCCURRENCE OR OFFENSE*
>
> *1. The following is added to COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV), paragraph 2. (Duties In The Event of Occurrence, Offense, Claim or Suit):*
>
> * * *
>
> *2. Notice shall be deemed prompt if given in good faith as soon as practicable to your workers' compensation insurer. This applies only if you subsequently give notice to us as soon as practicable after you, one of your "executive officers" (if you are a corporation), one of your partners (if your are a partnership), one of your managers (if you are a limited liability company), or an "employee" (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice discovers that the "occurrence", offense or claim may involve this policy.*

Assuming that Carson & Co. gave notice in good faith as soon as practicable to its workers' compensation insurer, Carson & Co. still did not give Travelers notice as soon as practicable after Carson & Co., one of its executive officers, or an employee designated by Carson & Co. to give such notice discovered that the Plaintiffs' claims or allegations might involve the 11/1/00-01 CGL policy, as required by the above provision.

IV.

UMBRELLA POLICIES

74. Travelers does not owe coverage for the Barrera complaint under the umbrella policies, and therefore has no duty to defend or indemnify Carson & Co., Romero, Kimbrough, Fowler, and Seamans under such policies, based on the grounds and policy provisions set forth below:

**A. Provisions common to all umbrella policies.**

75. The insuring agreement in the umbrella policies provides:

*COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY.*

*1. INSURING AGREEMENT.*

*a. We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies. This insurance applies only to:*

*(1) "Bodily injury" or "property damage":*

*(a) Occurring during the policy period; and*

*(b) Caused by an "occurrence"; and*

*(2) "Personal injury" or "advertising injury" caused by an "offense" committed during the policy period.*

*b. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".*

*c. "Property damage" that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the*

*"occurrence" that caused it.*

76. The umbrella policies, at Section V, "Definitions," define "advertising injury," "bodily injury," "occurrence," "offense," "personal injury," and "property damage" as follows:

*1. "Advertising injury" means injury arising out of one or more of the following "offenses":*

*a. Oral or written publication of material that slanders or libels a person or organization or disparages a persons or organizations goods, products or services;*

*b. Oral or written publication of material that violates a persons right of privacy;*

*c. Misappropriation of advertising ideas or style of doing business; or*

*d. Infringement of copyright, title or slogan.*

*Such "offenses" must be committed in the course of advertising your goods or products.*

* * *

*6. "Bodily injury" means bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness or disease sustained by a person, including death resulting from any of these at any time.*

* * *

*8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.*

*9. "Offense" means any of the offenses listed in the definition of "personal injury" or "advertising injury".*

*10. "Personal injury" means injury, other than "bodily injury", arising out of one or more of the following offenses:*

*a. False arrest, detention or imprisonment;*

*b. Malicious prosecution;*

*c. Wrongful entry into, or eviction of a person from a room, dwelling or premises that the person occupies;*

*d. Oral or written publication of material that slanders or libels a person or organization or disparages a persons or organizations goods, products or services;*

*e. Oral or written publication of material that violates a persons right of privacy; or*

*f. Discrimination because of race, religion, age, sex or physical disability. This does not apply:*

*(1) To "offenses" committed by or at the direction of the insured; or*

*(2) If insurance for such "offenses" is prohibited by law.*

*Such "offenses" must arise out of the conduct of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you.*

* * *

*12. "Property damage" means physical injury to tangible property, including all resulting loss of use of that property.*

77. The 11/1/98-99 umbrella policy includes an endorsement titled "Discrimination Exclusion," which states that "[p]art 10.f of SECTION V – DEFINITIONS is deleted." The 11/1/99-00 and 11/1/00-01 umbrella policies include endorsements titled "Discrimination Exclusion" providing that "[p]aragraph f. of the definition of 'personal injury' is deleted."

78. To the extent that the Plaintiffs seek damages for bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness, or disease, their claims are for "bodily injury." Their other alleged injuries and damages do not constitute "bodily injury." Plaintiffs do not

seek damages for any "property damage." Their claims for attorney's fees do not seek "damages." Plaintiffs do not allege an "occurrence," and their injuries and damages were not caused by an "occurrence." Some or all of the injuries and damages alleged did not occur during the 11/1/98-99 policy period; some or all did not occur during the 11/1/99-00 policy period; and some or all did not occur during the 11/1/00-01 policy period.

79. The Plaintiffs seek punitive damages. Such damages are recoverable in Alabama only if the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Such conduct does not constitute an "occurrence," and such damages are not caused by an "occurrence."

80. Plaintiffs do not seek damages for "advertising injury," or for any offense committed in the course of advertising Carson & Co.'s goods, products, or services. None of the claims in the complaint, with the exception of Count II ("Defamation-Slander") and possibly Count III ("Invasion of Privacy") to the extent that it is based on Romero's entering the women's bedrooms, seeks damages for "personal injury." Damages for bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness, or disease, which the umbrella policies define as "bodily injury," are expressly excluded from the definition of "personal injury" and so do not constitute "personal injury." None of the claims, injuries, or damages alleged in the complaint arose out of an offense committed in the course of Carson & Co.'s business. Some or all of the alleged offenses were committed outside the 11/1/98-99 policy period; some or all were committed outside the 11/1/99-00 policy period; and some or all were committed outside the 11/1/00-01 policy period.

81. The umbrella policies contain an exclusion barring coverage for "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured." This exclusion bars

coverage for the Plaintiffs' claims for damages for "bodily injury." It also bars coverage for the Plaintiffs' claims to the extent, if any, that they seek damages for "property damage." It also bars coverage for their claims for punitive damages.

82. The umbrella policies also exclude coverage for "[a]ny obligation of the insured under a workers compensation, disability benefits or unemployment compensation law or any similar law," provided that "[t]his exclusion does not apply to liability you assume under any contract or agreement." This exclusion bars coverage for the Plaintiffs' claims to the extent, if any, that Carson & Co., Romero, Kimbrough, Fowler, and Seamans are obligated for such claims under worker's compensation law or other laws referenced in the exclusion.

83. The umbrella policies also contain an exclusion for "'[p]roperty damage' to... [p]roperty you rent, occupy or which is in your care, custody or control if: ... [s]uch property ... is under the control of the insured." To the extent, if any, that the Plaintiffs seek damages for "property damage," this exclusion bars coverage.

84. The umbrella policies also contain an exclusion for "'[p]roperty damage to 'impaired property' or property that has not been physically injured, arising out of ...[a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." To the extent, if any, that the Plaintiffs seek damages for "property damage," this exclusion bars coverage.

85. The endorsement to the umbrella policies titled "Employment-Related Practices Exclusion" provides as follows:

A. *SECTION I, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, EXCLUSION 3.c. is replaced by the following:*

[This insurance does not apply to:]

* * *

c. *"Bodily injury" arising out of:*

(1) *Humiliation, mental injury or mental anguish directly or indirectly related to the employment of any person or persons by any insured;*

(2) *Refusal to employ;*

(3) *Termination of employment;*

(4) *Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or*

(5) *Consequential "bodily injury" as a result of (1) through (4) above.*

*This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or to repay someone else who must pay damages because of the injury.*

* * *

B. *SECTION I, COVERAGE B PERSONAL INJURY AND ADVERTISING INJURY LIABILITY EXCLUSION 3.h. is replaced by the following:*

[ This insurance does not apply to:]

h. *"Personal injury" arising out of:*

(1) *Discrimination directly or indirectly related to the employment or prospective employment of any person or persons by any insured;*

(2) *Refusal to employ;*

(3) *Termination of employment;*

(4) *Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment-related practices, policies, acts or omissions; or*

(5) *Consequential "bodily injury" as a result of (1) through (4) above.*

To the extent that the Plaintiffs seek damages for "bodily injury" or "personal injury," these exclusions bar coverage.

86. The endorsement to the umbrella policies titled "Personal Injury – Assumed by Contract" provides as follows:

*SECTION I – COVERAGES, Part 3.i. of EXCLUSIONS is replaced by the following:*

[This insurance does not apply to:]

* * *

*i.* (a) *"Personal injury":*

(1) *Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;*

(2) *Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period. All "personal injury" arising out of publication of the same or similar material subsequent to the beginning of the policy period is also excluded;*

(3) *Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;*

*or*

(b) *"Advertising injury":*

(1) *Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;*

(2) *Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period. All "advertising injury" arising out of publication of the same or similar material subsequent to the beginning of the policy period is also excluded;*

(3) *Arising out of the willful violation of penal statute or ordinance committed by or with the consent of the insured; or*

(4) *For which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.*

To the extent that the Plaintiffs seek damages for "personal injury," and to the extent, if any, that they seek damages for "advertising injury," one or more of these exclusions bar coverage.

87. The endorsement to the umbrella policies titled "Exclusion – Real and/or Personal Property" provides as follows:

*This endorsement modifies the insurance provided for the following property: (Check the appropriate block(s))*

*[X] Real property*
*[X] Personal property*

*As respects the type(s) of property check above, this insurance does not apply to "property damage" to:*

1. *property you own, rent, or occupy;*
2. *property loaned to you; or*
3. *property in your care, custody, or control.*

*Parts 2 and 3 above do not apply to liability assumed under a sidetrack agreement.*

To the extent, if any, that the Plaintiffs' seek damages for "property damage," this exclusion bars

coverage.

88. The 11/1/98-99 and 11/1/99-00 umbrella policies contain the following provisions regarding "Who Is An Insured":

> *1. If you are designated in the Declarations as:*
>
> * * *
>
> *c. An organization other than a partnership or joint venture, you are an insured.*
>
> *2. Each of the following is also an insured:*
>
> * * *
>
> *c. Except as respects aircraft and the "auto hazard":*
>
> *(1) Your executive officers, employees, directors or stockholders while acting within the scope of their duties....*
>
> * * *
>
> *h. Any other person or organization insured under any policy of the "underlying insurance". This grant is subject to all the limitations upon coverage under such policy other than the limits of the "underlying insurers" liability.*
>
> * * *
>
> *No person is an insured as respects "bodily injury" to a fellow employee unless insurance for such liability is afforded by the "underlying insurance".*

89. The 11/1/00-01 umbrella policy contains the same "Who Is An Insured" provisions, except that an endorsement titled "Amendment – Who Is An Insured" states that subpart 2.h. above is deleted and replaced by the following:

> *h. Any other person or organization insured under any policy of the "underlying insurance." This insurance is subject to all the limitations upon coverage under*

*such policy, and:*

(a) *The limits of insurance afforded to such person or organization will be:*

(i) *The difference between the "underlying insurance" limits and the minimum limits of insurance which you agreed to provide; or*

(ii) *The limits of insurance of this policy*

*whichever is less.*

*If the minimum limits of insurance you agreed to provide such person or organization are wholly within the "underlying insurance", this policy shall not apply.*

The umbrella policies define "underlying insurance" and "underlying insurer" as follows:

*"Underlying insurance" means the policies listed in the Schedule of Underlying Insurance and includes:*

*a.* *Any renewal or replacement of such policies; and*

*b.* *Any other insurance available to the insured.*

*"Underlying insurer" means any insurer which provides a policy listed in the Schedule of Underlying Insurance or any other insurance available to the insured.*

90. Romero, Kimbrough, Fowler, and Seamans are not insured under the umbrella policies, because the Plaintiffs' claims against them are not based on acts within the scope of their duties as officers, employees, directors, or stockholders, and because they are not insured for liability for "bodily injury" or other injuries or damages under any policy of underlying insurance. To the extent, if any, that Romero, Kimbrough, Fowler, and Seamans qualify as insureds under any policy of underlying insurance (including the CGL policies), and therefore under the umbrella policies, their

insurance under the umbrella policies is subject to all the limitations upon coverage under the underlying policy or policies.

91. The umbrella policies, in Section IV, "Conditions," include the following:

*DUTIES IN THE EVENT OF OCCURRENCE OR OFFENSE, CLAIM OR SUIT.*

*a. You must see to it that we are notified promptly of an "occurrence" or an "offense" which may result in a claim under this insurance. Notice should include:*

*(1) How, when and where the "occurrence" or "offense" took place; and*

*(2) The names and addresses of any injured persons and witnesses.*

*b. If a claim is made or 'suit' is brought against any insured which may result in a claim against this insurance, you must see to it that we receive prompt written notice of the claim or "suit."*

Carson & Co., Romero, Kimbrough, Fowler, and Seamans did not notify Travelers promptly of any alleged "occurrence," "offense," or "claim," as required by this provision.

92. The umbrella policies contain an "other insurance" provision stating that "[t]his insurance is excess over any other valid and collectible insurance whether such insurance is stated to be primary, contributing, excess, contingent or otherwise," provided that "[t]his provision does not apply to a policy bought specifically to apply in excess of this insurance." Thus, the umbrella policies are excess over other valid and collectible insurance.

**B. Other provisions in umbrella policies.**

93. The endorsement to the 11/1/98-99 umbrella policy titled "Discrimination Exclusion" provides as follows:

*A. Part 3.h. of EXCLUSION (SECTION I) is replaced by the following:*

[This insurance does not apply to:]

* * *

*h. "Personal injury" or "advertising injury" arising out of or consisting of discrimination.*

To the extent that the Plaintiffs seek damages for "personal injury," and to the extent, if any, that they seek damages for "advertising injury," this exclusion bars coverage.

94. The 11/1/99-00 and 11/1/00-01 umbrella policies include an endorsement titled "Discrimination Exclusion," providing as follows:

*SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; and COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY is amended by adding the following additional exclusion:*

*(This insurance does not apply to:)*

*"Bodily injury" or "personal injury" resulting from or as a consequence of discrimination, whether intentional or unintentional, based upon a person's sex, sexual preference, marital status, race, creed, religion, national origin, age, physical capabilities, characteristics or condition, or mental capabilities or condition.*

To the extent that the Plaintiffs seek damages for "bodily injury" or "personal injury," this exclusion bars coverage.

95. The 11/1/99-00 and 11/1/00-01 umbrella policies include an endorsement, titled "Knowledge and Notice of Occurrence or Offense – Unintentional Omission," which provides in pertinent part as follows:

*The following is added to SECTION IV - CONDITIONS, Part 5. DUTIES IN THE EVENT OF OCCURRENCE OR OFFENSE, CLAIM OR SUIT:*

e. *Notice of an "occurrence" or of an "offense" which may result in a claim under this insurance shall be given as soon as practicable after knowledge of the "occurrence" or "offense" has been reported to you, one of your executive officers (if you are a corporation), one of your partners (if you are a partnership), one of your managers (if you are a limited liability company), or an employee (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice.*

*Knowledge by other employee(s) of an "occurrence" or of an "offense" does not imply that you also have such knowledge.*

f. *Notice shall be deemed prompt if given in good faith as soon as practicable to your worker's compensation insurer. This applies only if you subsequently give notice to us as soon as practicable after you, one of your executive officers (if you are a corporation), one of your partners (if you are a partnership), one of your managers (if you are a limited liability company), or an employee (such as an insurance, loss control or risk manager or administrator) designated by you to give such notice discovers that the "occurrence", "offense" or claim may involve this policy.*

Carson & Co., Romero, Kimbrough, Fowler, and Seamans did not give Travelers notice of an "occurrence" or offense as soon as practicable after knowledge of such was reported to Carson & Co., one of its executive officers, or an employee designated by Carson & Co. to receive such notice. Assuming that Carson & Co. gave notice in good faith as soon as practicable to its workers' compensation insurer, Carson & Co. still did not give Travelers notice as soon as practicable after Carson & Co., one of its executive officers, or an employee designated by Carson & Co. to give such notice discovered that the Plaintiffs' claims or allegations might involve the 11/1/99-00 or 11/1/00-01 CGL policies.

96. The 11/1/00-01 umbrella policy includes an endorsement titled "Amendment of Insuring Agreement – Known Injury or Damage" that modifies the insuring agreement as follows:

A. *Only as respects COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Part 1.a. INSURING AGREEMENT of SECTION I -*

*COVERAGES is deleted and replaced by the following:*

1. *Insuring Agreement*

a. *We will pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. This insurance applies to "bodily injury" or "property damage" only if:*

(1) *The "bodily injury" or "property damage" is caused by an "occurrence" that takes place anywhere in the world;*

(2) *The "bodily injury" or "property damage" occurs during the policy period; and*

(3) *Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no employee authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized employee knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.*

B. *The following provisions apply only with respect to PROVISION A. above in this endorsement:*

1. *"Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any employee authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.*

2. *"Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any employee authorized by you to give or receive notice of an "occurrence" or claim:*

(a) *Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;*

*(b) Receives a written or verbal demand or claim for damages because of "bodily injury" or "property damage"; or*

*(c) Becomes aware by any other means that "bodily injury" or property damage" has occurred or has begun to occur.*

97. To the extent that the Plaintiffs seek damages for "bodily injury," and to the extent, if any, that they seek damages for "property damage," no coverage is afforded under this provision, because prior to the 11/1/00-01 policy period, an insured or an employee authorized by Carson & Co. to give or receive notice of an "occurrence" or claim knew that the "bodily injury" or "property damage" had occurred, in whole or in part.

98. Also, as previously stated, to the extent that the Plaintiffs seek damages for bodily injury, shock, fright, mental injury, disability, mental anguish, humiliation, sickness, or disease, their claims are for "bodily injury." Their other alleged injuries and damages do not constitute "bodily injury." Plaintiffs do not seek damages for any "property damage." Their claims for attorney's fees do not seek "damages." The Plaintiffs do not allege an "occurrence," and their injuries and damages were not caused by an "occurrence." Some or all of the injuries and damages alleged did not occur during the 11/1/00-01 policy period.

99. The Plaintiffs seek punitive damages. Such damages are recoverable in Alabama only if the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff. Such conduct does not constitute an "occurrence," and such damages are not caused by an "occurrence."

WHEREFORE, the premises considered, Plaintiff The Travelers Indemnity Co. of Illinois prays that the Court will:

(a) Determine and adjudicate the rights and liabilities of the parties with respect to the Travelers CGL and umbrella policies,

(b) Find and declare that the Travelers policies afford no coverage for Carson & Co., Romero, Kimbrough, Fowler, and Seamans with respect to the Barrera suit and that Travelers has no duty to defend or indemnify Carson & Co., Romero, Kimbrough, Fowler, and Seamans against the Barrera claims, and

(c) Grant such other, further, and different relief as may be warranted, the premises considered.

COOPER C. THURBER (THURC4686)
WILLIAM E. SHREVE, JR. (SHREW3946)
Attorneys for Plaintiff Travelers
Indemnity Co. of Illinois

OF COUNSEL:

LYONS, PIPES & COOK, P.C.
2 North Royal Street (36602)
Post Office Box 2727
Mobile, Alabama 36652
251/433-1820 - Fax
251/432-4481